THE SCANDINAVIAN AMERICAN BANK OF FARGO, North Dakota, a Corporation, Respondent, v. SIMON WESTBY, Appellant.

(172 N. W. 665.)

Bills and notes.

1. The giving of a renewal note does not create an estoppel so as to prevent the urging against the renewal note any defenses which the maker of the renewal note may have had against the enforcement and collection of the original note. As between the original holder and maker of the note, where the holder of such original note or obligation has not parted with anything of value or assumed a more detrimental position by reason of the taking of the renewal note, any defense to or infirmity of the original note which might have been opened to

the maker of the original note, **in the** event he had been sued thereon, is equally open and retained to him where he has executed the renewal note and suit is brought upon the renewal note.

**Renewal notes.**

2. Bank stock is ordinarily presumed to be worth par until the contrary appears by competent evidence.

**Estoppel.**

3. Where one becomes surety upon a negotiable instrument, and, at the time of entering into the contract of suretyship, the holder of such negotiable instrument has additional security for the payment of the debt, such additional security is in the nature of a trust fund in the hands of the holder of such note to secure the payment thereof, and such holder must use ordinary care to protect such additional security and not permit such security to be lost, converted, or deteriorated by want of ordinary care, and must use ordinary care to properly preserve said security in order that the same may be applied to the discharge of the original obligation, or, if the original obligation is discharged by the surety, then such additional security should be protected, preserved, and cared for by the holder of the original obligation by the exercise of ordinary care and prudence with reference thereto, in order that the surety may reimburse himself from such additional security, he having discharged the original obligation.

Opinion filed September 9, 1918.

APPEAL from judgment of the District Court of Williams County, North Dakota, Honorable *Frank E. Fisk,* Judge.

Reversed.

*J. J. Murphy, H. W. Braatalien, Henry G. Middaugh,* and *Albert E. Coger,* for appellant.

The pledgee is bound to exercise the degree of care which an ordinarily prudent man usually bestows on his own property of like nature under the circumstances. Jones, Liens, 2d ed. p. 431.

When a chose in action such as a bond, note, or accepted order of a third person is transferred and delivered to a creditor as collateral security it is the duty of the pledgee to use reasonable care and diligence to make such collateral available. 22 Am. & Eng. Enc. Law, 2d ed. 899; Phares v. Barbour, 49 Ill. 370.

Where the party complaining has made no change in his position to his detriment, the doctrine of estoppel does not apply. Grebe v. Swords, 28 N. D. 330; Pacific R. Co. v. Carr, 159 Pac. 529; Hutchins v. Stan-

ley, 129 Pac. 1180; Casmer v. Hoskins, 128 Pac. 841; Southall v. Rigg, 11 C. B. 481; Edwards v. Chancellor, 52 J. P. 454; Bullion Min. Co. v. Cartwright, 10 Ont. L. Rep. 438; Compare Tuttle v. Smith, 5 N. B. 643; Kelly v. Allen, 34 Ala. 663; Cochrane v. Perkins, 148 Ala. 689, 40 So. 351; Dalton First Nat. Bank v. Black, 108 Ga. 538, 34 S. E. 143; Wheelock v. Berkeley, 138 Ill. 153, 27 N. E. 942; Tyler v. Anderson, 106 Ind. 185, 6 N. E. 600; Compare Beattyville Bank v. Roberts, 117 Ky. 689, 78 S. W. 901; Commonwealth Ins. Co. v. Whitney, 1 Met. 21; Hooker v. Hubbard, 102 Mass. 239; Widger v. Baxter, 190 Mass. 130, 3 L.R.A.(N.S.) 436, 76 N. E. 509; Seager v. Drayton, 217 Mass. 571, 105 N. E. 461; Hunt v. Rumsey, 83 Mich. 136, 9 L.R.A. 674, 47 N. E. 105; Murphy v. Gay, 37 Mo. 535; Earle v. Robinson, 91 Hun, 363, 70 N. Y. S. R. 831, 36 N. Y. Supp. 178, affirmed in 157 N. Y. 683, 51 N. E. 1090; Casner v. Hoskins, 64 Or. 254, 128 Pac. 841, rehearing denied in 64 Or. 282, 130 Pac. 55; Geiger v. Cook, 3 Watts & S. 266; Adams v. Ashman, 203 Pa. 536, 53 Atl. 375; Mason v. Jordan, 13 R. I. 193; Central Bank etc. Co. v. Ford, 152 S. W. 700; Comings v. Leedy, 114 Mo. 454; Alabama Nat. Bank v. Halsey, 109 Ala. 196.

A pledgeor is not entitled to the return of the identical stock. 22 Am. & Eng. Enc. Law, 2d ed. at page 874; the rule is stated and cases cited.

*Pierce, Tenneson, & Cupler* and *Palmer, Craven, & Burnes,* for respondents.

A person primarily liable on an instrument is the person who by the terms of an instrument is absolutely required to pay the same. Comp. Laws 1913, § 7076; First Nat. Bank v. Meyer, 30 N. D. 388, 152 N. W. 657; Northern State Bank v. Bellamy, 19 N. D. 509, 31 L.R.A.(N.S.) 149, 125 N. W. 888; 8 C. J. p. 620, note 19; German Am. Bank v. Watson, 163 Pac. 637.

Where both parties move for a directed verdict it is proper for the court to discharge the jury and decide all questions of law and fact. Van Woert v. Modern Woodmen, 29 N. D. 441, 151 N. W. 224; Jasper v. Hagan, 4 N. D. 1; Ruetell v. Insurance Co. 16 N. D. 546, 113 N. W. 1029; Bank v. Weber, 19 N. D. 705; Griffith v. Fox, 32 N. D. 650; Drexel State Bank v. Kittel (N. D.) 164 N. W. 152.

Where the court decides the questions of both law and fact, such

findings will not be reversed unless clearly shown to be against preponderance of the testimony. Ruetell v. Insurance Co. 16 N. D. 546, 113 N. W. 1029; Bank v. Weber, 19 N. D. 705; Griffith v. Fox, 32 N. D. 650; Drexel State Bank v. Kittel (N. D.) 164 N. W. 152.

A pledgee of stock is not liable if such stock depreciates in value through no fault of his. Granite Bank v. Richardson, 7 Met. 407; Jones, Pledges, § 606; Little Rock Trust Co. 90 S. W. 847, 3 L.R.A. (N.S.) 1200; Culver v. Wilkinson, 145 U. S. 205, 36 L. ed. 676, 680, 12 Sup. Ct. Rep. 832. See also Jones, Collateral Securities, §§ 434 & 728.

In questions of estoppel, if the deed or contract in question has in fact been ratified and the ratification is sufficient, there is no need of invoking the doctrine of estoppel. 31 Cyc. 1245–1250; Capps v. Hensley (Okla.) 100 Pac. 515; 8 C. J. pp. 444, 445, notes 17 & 18; pp. 724, 725, notes 43 to 46 and cases therein cited; Comp. Laws 1913, § 5865. See also Comp. Laws 1913, § 5866; Lee v. McClellan (Cal.) 52 Pac. 300.

One who gives a note in renewal of another note, with knowledge at the time of a partial failure of the consideration of the original note or of false representations by the payee, waives such defenses and cannot later set up to defend or reduce and recover on the renewal note. 8 C. J. pp. 444, 445, notes 17 & 18; pp. 724, 725, notes 43 to 46 and cases therein cited.

A contract which is voidable solely for want of due consent may be rectified by subsequent consent. Comp. Laws 1913, § 5865. See also Comp. Laws 1913, § 5866; Lee v. McClellan (Cal.) 52 Pac. 300; 16 Cyc. 787 to 791; Hoyt v. McIntyre (Minn.) 52 N. W. 918; Daniels v. Cower (Iowa) 3 N. W. 424; Blight v. Schench, 51 Am. Dec. 478; Langdon v. Brown (Pa.) 28 Atl. 921; Jackson v. Lynn, 58 Am. St. Rep. 366.

GRACE, J. Appeal from the judgment of the district court of Williams county, North Dakota, Honorable Frank E. Fisk, Judge.

The complaint states an action to recover upon a promissory note executed by defendant to plaintiff for $2,320.64. The answer admits the execution and delivery of the note, but denies it was executed for valuable consideration. The defendant, in a very extensive answer, sets

out other defenses. To the answer there is a reply interposed. It is not necessary to set out the answer in full, but the substance of the answer is that on August 8, 1911, J. A. Stafne executed and delivered to plaintiff a promissory note for $1,745.90, with interest at 12 per cent payable November 1, 1912. At the time the note was executed, there was pledged to plaintiff as collateral security to said note, certain stock certificates of the Citizens State Bank of Alexander of the par value of $100 per share. The answer further states that in the year 1913, A. J. Stafne was the owner of twenty-five shares of the corporate stock of the Williston State Bank of the par value of $100 per share. It is claimed by the defendant that about the 1st day of August, 1913, A. J. Stafne gave defendant an option to purchase the twenty-five shares of the corporate stock of the Williston State Bank, with the understanding that if the same were purchased by the defendant the purchase price thereof should be applied upon indebtedness of A. J. Stafne to the Williston State Bank of which the defendant was president, director, and stockholder.

The defendant further alleges that the par value of said twenty-five shares of the Williston State Bank stock was $2,500. Defendant alleges that the plaintiff falsely and fraudulently represented to the defendant that the plaintiff was holding the stock certificates of the twenty-five shares of stock of the Williston State Bank as collateral to a debt evidenced by the promissory note upon which this action is brought, and that plaintiff further fraudulently and falsely represented unless defendant signed the note upon which this action is brought, the plaintiff would not deliver possession of the twenty-five shares of stock of the Williston State Bank to defendant; that the defendant relied upon the false representations made by the plaintiff, and believed them to be true and was thereby induced to execute the promissory note involved in this suit. Defendant further alleges that the plaintiff, at the time of making such false and fraudulent representations as to his right to the possession of said corporate stock, did not hold the same as collateral security or have any right to the possession thereof, as against A. J. Stafne or the defendant, and that A. J. Stafne was then the owner of said stock and entitled to the immediate possession thereof. Defendant further claims that the plaintiff represented to the defendant that the defendant was fully pro-

tected in signing said note by reason of the fact that the same was secured by the corporate stock of A. J. Stafne of the Citizens State Bank of Alexander of the par value of $2,000. The answer sets forth the disposition of the twenty shares of stock of the Citizens State Bank of Alexander and the assignment and transfer thereof by the plaintiff, and alleges the par value thereof to be the sum of $2,000, and alleges the actual value thereof to be $2,500. The defendant admits the execution, on March 25, 1914, of a note for $2,205 bearing 8 per cent interest and due in ninety days after date, and alleges this note was given for the amount then claimed to be due on the $1,745.90 note, the payment of which he had guaranteed. Defendant claimed that he signed such note on account of the assurances made by the plaintiff on November 28, 1913, that all the matters connected with the affairs of the Citizens State Bank at Alexander would be adjusted, and similar assurances at the time of the execution of the guaranty by the defendant that the stock of said bank afforded abundant security for the loan guaranteed by the defendant and the cause of the expectation of the defendant that said bank stock would be accounted for by plaintiff, and, when accounted for, that the value of the stock would exceed the amount of defendant's obligation, and because he knew that the defendant's obligation was being carried as an asset by plaintiff's bank; that renewal was necessary from time to time in order that it might be considered suitable bank paper, he executed renewals of the original obligation, and further alleges that the fact of defendant's expectation that plaintiff would account for said collateral and his continued reliance thereon was, at all times, from the 28th day of November, 1913, well-known to the plaintiff. The answer then sets out all the matter alleged therein from ¶¶ 3 to 12, both inclusive, and realleges them by way of counterclaim.

The plaintiff, in its reply, alleges the delivery of the note to it on August 8, 1911, by J. A. Stafne, and the pledging therewith at that time, as collateral security thereto, the twenty shares of stock of the Citizens State Bank of Alexander. The reply further alleges, in substance, that the consideration of the delivery to the defendant by the plaintiff of twenty-five shares in the Williston State Bank was the guaranty of the payment at maturity, of the note sued upon; that said guaranty was indorsed upon said note and was in the following words:

"For value received, I hereby guarantee the payment of the within note at maturity or any time thereafter, with interest at the rate of 12 per cent per annum until paid, waiving demand, notice of payment, and protest," which guaranty was signed by the defendant.

It is further alleged, in substance, that the defendant then and there agreed that the said stock certificates were to be sold and the proceeds paid to plaintiff to take up said note; that plaintiff would sell such stock; that the proceeds were not remitted to plaintiff or received. The reply further, in substance, alleges the financial difficulty of the Citizens State Bank of Alexander; that the sale of said bank or the stock therein was being negotiated by the majority stockholders; that the defendant held stock in the Citizens State Bank of Alexander; that it was understood between the plaintiff, then officer of the plaintiff bank, and defendant, that said stock certificates representing twenty shares of the capital stock of the Citizens State Bank of Alexander, held by the plaintiff as collateral security, should be delivered to the plaintiff A. J. Stafne for the purpose of taking the same to Alexander, North Dakota, and having the same transferred or reissued upon the reorganization of said bank and to return the same to the plaintiff; that said stock certificates were never returned to the plaintiff, and that the delivery thereof to the said Stafne was made at the request of the defendant and with his full knowledge, consent, and approval. The reply further, in substance, alleges the execution of a note on March 25, 1914, for $2,205, and one on November 20, 1914, for $2,320.64. Each of said notes was claimed to represent the amount due upon the $1,745.90 note, the original obligation, at the respective dates of their execution. Defendant further, in his reply, alleges, in substance, that on August 18, 1915, plaintiff and defendant made a full settlement of all matters and differences between them arising out of the transactions aforesaid on said date, and an agreement, in writing, was executed between the parties wherein the defendant agreed that the note described in the complaint was and is a valid obligation of his, and that it was and is due thereon, the full amount of said note for principal and interest as is shown thereby, subject only to credit to be thereafter made of the actual cash value of twenty shares of the capital stock of the Citizens State Bank of Alexander on the date said bank was sold or the stock of Eric Stafne therein was transferred by

him. The defendant therein agreed to pay the amount due upon said note as such credit on or before November 15, 1915, and that the title to said stock and the right to sue for, recover, and retain the value thereof or the proceeds of any sale thereof, should be vested in plaintiff; that it was therein agreed that the value of said stock would be determined by arbitration; that there were to be three arbitrators,— one selected by the plaintiff, one by the defendant, and the two to select the third; that the plaintiff selected its arbitrator and then advised the defendant thereof; that such arbitration was never completed. That the value of the said twenty shares of the stock in the Citizens State Bank of Alexander, at the time aforesaid, was not to exceed the sum of $350. A concise statement of the facts is as follows:

J. A. Stafne and A. J. Stafne were the principal stockholders of the Citizens State Bank of Alexander, in which they were directors and officers. Eric Stafne is their father. H. J. Hagan is their uncle, and H. J. Hagan and Eric Stafne are brothers-in-law. The Citizens State Bank of Alexander was organized in 1909 with a capital stock of $10,000. Hagan held $1,000 of stock. The Citizens State Bank of Alexander later became involved in financial difficulty, the exact time when such financial difficulty commenced being somewhat in dispute. The plaintiff claimed it was early in January, 1912, and the defendant that it was after the note dated November 23, 1913, was signed. On the 23d day of November, 1914, the state bank examiner took charge of the bank and required that $17,000 of doubtful paper be replaced, and that John and Albert Stafne sever their connections with the institution. Eric Stafne paid, in cash, $17,000, and took the paper to which objection had been made by the bank examiner.

H. J. Hagan was connected with the Scandinavian Bank of Fargo, the plaintiff, and was the manager thereof. J. A. Stafne and A. J. Stafne made a loan from the plaintiff for $1,745.90, to which was pledged as collateral security $2,000 of the stock of the Citizens State Bank of Alexander, and the defendant claims $1,700 and the plaintiff $2,500 of the stock of the Williston State Bank was also pledged as collateral security to such note. A. J. Stafne was also interested in the Williston State Bank and had twenty-five shares of stock therein, which was the stock turned over to Westby by plaintiff.

The $1,745.90 note was not paid at maturity and it was renewed

three different times. The first time was on November 28, 1913, when Simon Westby and Albert J. Stafne executed a renewal note for $2,148.25. The second note was March 25, 1914, for $2,205, signed by the same parties. The third renewal, signed by the defendant only, was for $2,320.64, dated November 20, 1914, and is the note upon which suit is brought.

The first point which we consider is whether or not the defendant, by the giving of the renewal notes from time to time, is estopped to urge any defenses which he may have had against the enforcement and collection of the original note, to renew which renewal notes were executed. In other words, if there existed any infirmity in the original note, after the defendant has executed renewals of the original note is he estopped to set forth and rely upon the original infirmity or defense which he had, if any, to the original note? We are of the opinion that as between the original parties to the obligation where the holder of such note or obligation has not parted with anything of value, or assumed a more detrimental position by reason of the taking of a renewal note or obligation, that any defense or infirmity defendant might have taken the advantage and benefit of if he had been sued upon the original obligation, is equally open and retained to him where he has executed renewal note or notes, and suit is brought upon the renewal note, and there is no good reason why this should not be so. The renewal note or obligation is but the old note or obligation which is extended in the form of the renewal note. The renewal of notes may be said to be of as much benefit to the holder as to the maker thereof; while the renewal, in almost all cases, operates to extend the time of payment to the maker, the holder is benefited by having live paper which is of more use in the business world than past-due paper, and, with these and a few other minor differences, the renewal note is the same obligation as the original note. Grebe v. Swords, 28 N. D. 330, 149 N. W. 126.

It is true several courts notably among them Arkansas laid down the rule substantially that a renewal of a note, with knowledge that the original was without consideration, would prevent any inquiry into the facts, and hold that the renewal operates as an estoppel for the reason that the renewal note is a written acknowledgment of a debt, with knowledge that no debt existed. This rule, as we view it, does not

appeal to us as being based upon sound reasoning, nor does it appeal to our sense of justice. If when a renewal note is given, the position of the parties is the same as at the time of the giving of the original obligation, and there was no consideration for the original note, the fiat of the court cannot instill a consideration into the renewal note. In other words, the court, by judicial fiat, cannot create something out of nothing.

The second important point is the value of the twenty shares of the bank stock of the Citizens State Bank of Alexander. We think it is a fair presumption that the bank stock is at least worth par. There is no evidence introduced that would, in any way, disturb this presumption. In fact, most of the evidence that was introduced would have the tendency to sustain this presumption; as, for example, where it is shown by the evidence that Eric Stafne put in $17,000 in cash to take up certain bad paper ordered out of the bank by the bank examiner.

The presumption would necessarily follow that there was no more bad paper in the bank, and that the bank was solvent and the bank stock worth at least par. As the record now stands, we must hold that the bank stock of the Citizens State Bank of Alexander was worth par, and even if Eric Stafne had not put in the $17,000, the presumption would, nevertheless, be entertained that the bank stock was worth par until the contrary was made to appear by competent evidence.

The third and last point relates to the conversion by the plaintiff of the collateral; to wit, the bank stock in the Citizens State Bank of Alexander. This is the most important point of the case, and involves an examination and construction of that part of the Uniform Negotiable Instruments Law, in its relation to the subject we are examining. It must be conceded that the relation of Westby to the plaintiff, the holder of the note, was that of surety. This is the most favorable relationship to the plaintiff that, it may be conceded, defendant occupied. Defendant's relation on the original note was that of guarantor. However, under our statutes, we think it is immaterial whether the relation of the defendant is considered that of a guarantor or a surety, in view of § 6682 of the Compiled Laws of 1913, which provides that a surety has all the rights of a guarantor whether he becomes personally responsible or not.

Section 7004 of the Uniform Negotiable Instruments Act is as follows:

"A negotiable instrument is discharged:

"1. By payment in due course by or on behalf of the principal debtor.

"2. By payment in due course by the party accommodated where the instrument is made or accepted for accommodation.

"3. By the intentional cancelation thereof by the holder.

"4. By any other act which will discharge a simple contract for the payment of money.

"5. When the principal debtor becomes the holder of the instrument at or after maturity in his own right."

In § 7005, discharged secondarily.

"A person secondarily liable on the instrument is discharged:

"1. By any act which discharges the instrument.

"2. By the intentional cancelation of his signature by the holder.

"3. By the discharge of a prior party.

"4. By valid tender of payment made by a prior party.

"5. By a release of the principal debtor unless the holder's right of recourse against the party secondarily liable is expressly reserved.

"6. By any agreement binding upon the holder to extend the time of payment or to postpone the holder's right to enforce the instrument unless made with the assent of the party secondarily liable or unless the right of recourse against such party is expressly reserved."

Since both parties, in the case, have treated the defendant's relation as one of suretyship, we shall use the term "surety" in our further discussion.

The claim of the plaintiff, in short, is that Westby, being a surety, his liability is a primary one, and nothing the plaintiff might do by way of surrender of collateral or the extension of time without the knowledge or consent of the surety would, in any manner, cause the plaintiff any liability to the defendant. In other words, the plaintiff's claim amounts to this,—that the holder of the note, to secure the payment of which there was admittedly abundant collateral security, and, at the same time having a surety on the note and knowing him to be such, may act with a free rein. He may turn the collateral back to the original debtor, or may otherwise dispose of it; may extend the time of payment, and, in fact, act with entire disregard as to the rights

of the surety and with total disregard to his liability as a trustee without incurring any liability on his part,—all on the theory that primary liability of the s¬rety relieves the holder of the note from all liability and responsibility to the surety arising out of any collateral security to the original note, or arising out of the extension of the time of payment of the original note, or in any other manner. If the Uniform Negotiable Instruments Act, as applied to this situation, means that the holder of the note, although he has abundant collateral security for his note, other than that of the surety, can deliberately dispose of the collateral or return it to the original debtor, or otherwise disposing of it, and can extend the time of payment without knowledge or consent of the surety, all without incurring any liability on his part to the surety, it appeals to our sense of fairness and justice in just about the same proportion as a strangle-hold, where, in a con-test of strength and science, one wrestler secures this deadly hold and, slowly but surely, chokes his opponent into insensibility. We do not believe that primary liability of a surety means what several of the courts have said it means.

As a general rule, the surety signs the original note or instrument, and is thus an original promisor, and if the original instrument has consideration, that is, if the consideration of the original instrument is sufficient to uphold the contract of surety, in such case, the surety is an original promisor and may be sued upon default occurring in the note or instrument which he signed. His liability may thus be considered a primary one. In the consideration of this case, we will assume and consider the liability of the defendant a primary one. Having in this case arrived at the conclusion that the defendant is a surety, and assuming that his liability is a primary one, the next point to analyze is whether § 7004 of the Compiled Laws of 1913 repeals all our laws relative to suretyship, either directly or otherwise. The merest inspection of such section determines that it does not directly attempt to repeal any of our statutory laws relative to the rights, duties, and remedies of surety. The law does not favor the repeal of existing law by mere implication, and even if it did we find no basis, in said section, from which it might be inferred that the repeal of the laws concerning suretyship was implied. A careful examination of § 7004, supra, discloses that the five ways therein specified in which a nego-

tiable instrument may be discharged do not apply exclusively to the maker of the note, but some of the subdivisions of said section apply also to the holder. The first subdivision implies that a negotiable instrument is discharged by payment in due course, by or on behalf of the principal. The second subdivision is by payment in due course by the party accommodated. The third is by intentional cancelation by the holder. The fifth, when the principal debtor becomes the holder of the instrument in his own right. It is self-evident that the negotiable instrument would be discharged under such circumstances. That would be true if there were never any law enacted upon the subject. The fourth subdivision of said section, however, is not so easily understood or so simple of construction. It is as follows: "By any other act which will discharge a simple contract for the payment of money."

Keeping in mind the other subdivisions of said section, that the negotiable instrument may be discharged by certain acts not only of the maker but by the holder, we believe the language of subdivision 4 applies to both the maker and the holder. There may be other ways than those set forth, whereby the maker may show that the negotiable instrument is discharged. For instance, that the contract was fraudulent or obtained under duress. The surety being primarily liable and an original promisor, the holder of the note might do certain acts which would operate to discharge the liability of the surety on such note, and thus discharge the instrument so far as the surety is concerned. If the law of suretyship has not been repealed, and we hold that it has not, if the holder of the note should, without the knowledge or consent of the surety, extend the time of the payment to a time certain, so far as the surety is concerned, the contract and instrument, being a simple one for the payment of money, is discharged. Again, if the holder of the note, at the time of the signing thereof by the surety had taken collateral security from the principal debtor, it must be held that he holds such collateral in trust, and if the surety pays the obligation, he is entitled to stand in the shoes of the creditor and reimburse himself by having such collateral applied in reduction of the amount of money which the surety has paid the holder.

The holder of the note is under no obligation to first realize on the collateral before suing the surety. The holder may proceed against the surety without having first realized upon the collateral security,

for the reason that the surety's liability is a primary one, but the holder must, nevertheless, be faithful to his trust in preserving the collateral, and must use ordinary care and vigilance to preserve it, and must not dispose or convert it; and if the collateral is realized upon, the value thereof must be indorsed upon the note.

Suretyship, in its narrow sense and as applicable to this case, is defined in 32 Cyc. page 14, as follows: "Suretyship, in its narrower sense, is a legal relation based upon contract between competent parties, in which one person undertakes as the object of such contract to answer to another for the debt, default, or miscarriage of a third person; the third person's liability to the second person being thus similar to that of such first person."

Section 6675 of the Compiled Laws of 1913 defines suretyship as follows: "A surety is one who at the request of another and for the purpose of securing to him a benefit becomes responsible for the performance by the latter of some act in favor of a third person or hypothecates property as security therefor."

Section 6676 of the Compiled Laws of 1913 is as follows: "One who appears to be a principal, whether by the terms of a written instrument or otherwise, may show that he is in fact a surety, except as against persons who have acted on the faith of his apparent character of principal."

Section 6677 of the Compiled Laws is as follows: "A surety cannot be held beyond the express terms of his contract, and if such contract prescribes a penalty for its breach he cannot in any case be liable for more than the penalty."

Subdivision 2 of § 6681 of the Compiled Laws of 1913 is as follows:

"How exonerated.  A surety is exonerated:

"1. In like manner with a guarantor.

"2. To the extent to which he is prejudiced by any act of the creditor which would naturally prove injurious to the remedies of the surety or inconsistent with his rights or which lessens his security; or

"3. To the extent to which he is prejudiced by an omission of the creditor to do anything when required by the surety which it is his duty to do."

Section 6683 provides that the surety may require his creditor to

proceed against the principal, and, if the creditor neglects to do so, the surety is exonerated.

Section 6686 provides that when a surety has satisfied the obligation of the principal, he is entitled to enforce every remedy which the creditor then had against the principal, until he is reimbursed for what he has expended. He can also require a contribution from cosureties.

Section 6687 provides: "A surety is entitled to the benefit of every security for the performance of the principal obligation held by the creditor or by a cosurety at the time of entering into the contract of suretyship or acquired by him afterwards, whether the surety was aware of the security or not."

Section 6688 provides: "Whenever property of a surety is hypothecated with the property of the principal, the surety is entitled to have the property of the principal first applied to the discharge of the obligation."

Have all these various provisions been abrogated by the Uniform Negotiable Instruments Act? We are certain they have not, and that they still stand as the law of this state with reference to suretyship, and were never intended to be repealed, and were protected under subdivision 4 of § 7004.

In the case at bar at the time of the signing of the original note, the plaintiff knew that the defendant was a surety. He had like knowledge at the time of the signing of each renewal note, including the note sued upon. The relation of the defendant was, at all times, one of surety. At the time the original note was signed, the plaintiff held, among other collateral security, twenty shares of the Citizens State Bank of Alexander, and twenty-five shares of the Williston State Bank. All this security was itemized on the back of the note which the defendant originally guaranteed and just above the guaranty of the defendant. All parties had knowledge of the collateral which was deposited with the plaintiff to secure this same debt.

What, then, was defendant's contract at the time of the signing of the original note? What, then, was in contemplation and what was the understanding and agreement at that time? So far as the defendant is concerned, we think it must be conceded that, there appearing to have been sufficient collateral security to cover the payment

of the original obligation, and this fact being well-known to both the defendant and the plaintiff, it was the main inducement of the defendant in signing the note, and this consideration was at the very basis of the contract and the plaintiff knew it. The plaintiff must have known that the collateral security at the time of the signing of the original note, being sufficient to pay the original debt, was the inducing cause for defendant to attach his name as further security for the payment of the original debt. All of this was well-known to the plaintiff, for he had full knowledge of all the security which he held as collateral to the original debt. The defendant having entered into the contract under these conditions, can the plaintiff, without the consent and against the will of the defendant, in effect change the terms of such contract so as to impose upon defendant a greater liability than was assumed by defendant at the time he entered into the contract? Can the plaintiff dispose of all the collateral security or fail to exercise ordinary diligence so that the value of the security is largely diminished, or show that the same becomes of no value and thus make the defendant liable practically for the whole debt, when at the time of the signing of the contract, if the collateral were properly taken care of and used in the payment of the debt or preserved by the plaintiff for defendant in case defendant paid the debt, there would be practically no loss to the defendant? To hold that the plaintiff could do so would be to hold that the plaintiff could add other obligations to the contract which did not exist at the time of the making of the contract, and which were not in the contemplation of either party, and especially were not in the contemplation of the defendant.

We believe the contract in its inception that was in the minds of the parties was that if default were made in the payment of the principal obligation by the debtor, and the defendant was compelled to pay it, all the collateral security would be preserved to defendant and all the rights of the creditor turned over to the defendant, that he might reimburse himself for the money which he had paid out to satisfy the original obligation. This must also have been in the minds of the plaintiff. It could hardly be otherwise, he having full knowledge of the collateral security and having possession thereof. The defendant entered into the contract to pay the original obligation or discharge the original instrument with all these considerations in mind, all of which

were well-known to the plaintiff. The collateral security was held by the plaintiff in trust for the payment of the original obligation, or if the original obligation were paid by defendant, the collateral was held in trust to be turned over to him, if the defendant were compelled to pay the original obligation. If the plaintiff converts such collateral security to his own use, the instrument is discharged to the extent the collateral security has been decreased in value by failure of the creditor to exercise ordinary diligence in preserving the security; or if, after notice by the surety to proceed against the principal, and the principal fails to do so, the instrument is discharged to the extent of the damages which the defendant may show by reason of the creditor's failure to proceed. In other words, the contract which the defendant entered into is discharged to the extent herein indicated, and where action is brought on the original instrument, or where an action is brought against the surety by the original holder, it is proper to set up and plead such damages, if any, by way of counterclaim, as a cause of action against the plaintiff.

If the creditor extends the time of payment to a time certain, without the knowledge or consent of the surety, such extension operates to discharge the surety from his contract, and to discharge the instrument so far as the surety is concerned. It is simply another way in which under subdivision 4 of § 7004, a simple contract for the payment of money may be discharged, and there is no reason why this should not be so; for to hold that the surety can be held on a note which has been extended to a time certain without his knowledge or consent is to hold that he can be held on a contract which he never made. To illustrate:

Supposing A executes a note to B for $1,000 which A owes B. The note is due one year from the date of its execution. C signs the same as surety. At the time A executes the note he is worth $20,000. At the maturity of the note, A and B, without the knowledge or consent of C, extend the time of the payment of the note for five years to a time certain. During such five years, B cannot maintain an action against A for the recovery of the debt. During the five years A becomes bankrupt. Should C be held to pay the debt? It is evident that if the suit had been brought at the end of the year when default was made in the first note B would have gotten his money and C would not have suffered, but, by the extension of time, a new contract between

A and B was made in which C was not a party and C's loss is also by reason of the new contract to which he is not a party. What sensible or just reason is there, if any, why C should not be discharged from his contract on such instrument? There can be none and there is none, for the circumstances and conditions which compel C's loss are not the conditions to which he contracted.

The contract has been, in fact, changed without his consent, and he is discharged from the instrument and from liability, and we hold that such a condition was contemplated under subdivision 4 of § 7004, to discharge one from a simple contract for the payment of money where the circumstances, we have above illustrated, exist.

We hold that all the rights of suretyship, the right of subrogation, are all brought under subdivision 4 of § 7004. This is the only reasonable construction to be placed upon such section. In this connection it must not be lost sight of that § 6943 of the Compiled Laws of 1913 provides as follows: "In the hands of any holder other than a holder in due course, a negotiable instrument is subject to the same defenses as if it were non-negotiable."

If a negotiable instrument is taken in due course of business in the belief that all the signers of such note are makers, and with no knowledge by the one who takes said note that any of the signers thereon are sureties, the surety could claim no benefit by reason of his relation as a surety instead of maker, until knowledge of the suretyship is brought home to the holder of the note. If, however, a holder in due course has knowledge of the suretyship and has collateral security for the payment of the debt from the time he acquired such knowledge, he is in no different position than any other holder of the note, and must have due regard to the rights of the surety, and exercise ordinary diligence to preserve the collateral security. He must bear in mind that a surety cannot be held beyond the express terms of his contract.

The plaintiff also claims that the defendant had knowledge of the necessity for the transfer of the stock for the Citizens State Bank of Alexander and of the plaintiff's intention to surrender the stock for the purpose of having new stock issued, and for this reason the defendant cannot be heard to complain. As we view this matter, plaintiff held the stock of the Citizens State Bank of Alexander as collateral security, and he was trustee of it; and while the same was collateral

to a debt which was owing him, he also held it as trustee for the defendant, who was surety. Plainly it was the plaintiff's duty to protect the rights of the surety and to use ordinary diligence to preserve the security. This was his duty whether the defendant had knowledge of it or not. The plaintiff also had the possession of the collateral, the bank stock in question, and it was his duty to keep possession of it and preserve it in order that defendant might have the benefit of it if he were compelled to pay the debt.

It is clear the defendant did not authorize or consent to the conversion of the collateral by any person, and if the defendant did have knowledge that the plaintiff was turning the stock over to Eric Stafne for the purpose of having it reissued in the form of new stock, this knowledge would, in no manner, relieve the plaintiff from the necessity of accounting to the defendant for the value of said stock if plaintiff should pay the obligation to which such stock was collateral.

The defendant did not consent to the conversion of the stock by Eric Stafne or anyone else. The defendant admits his liability upon the note sued upon and counterclaims for the value of twenty shares of the Citizens State Bank of Alexander which have a par value of $100 per share, there being no evidence to controvert the presumption that the stock is worth par.

We are of the opinion that such counterclaim is a proper one, and, under the evidence as it now stands, the defendant should have judgment for the value of the twenty shares of stock of the Citizens State Bank of Alexander at par, with interest thereon at the legal rate since the date of the conversion of said stock.

We are of the opinion that the matters disputed as a counterclaim were available by way of defense. From this view of the case, the only judgment plaintiff is entitled to is the excess of the note and interest over and above par value of the stock, with interest at the legal rate since the conversion.

Though the surety is primarily liable that does not relieve the creditor or the holder of the note from liability if he does not use ordinary diligence in preserving the security which has been hypothecated to secure the payment of the note, nor (in the opinion of the writer), can the creditor and the principal debtor, by agreement between themselves without the knowledge or consent of the surety, extend the time

of payment to a time certain, thus, in effect, making a new contract, and if such is done the liability of the surety, in my opinion, ceases.

While the members of the court disagree upon some of the questions, and the views expressed in this opinion are not shared by a majority of the court, a majority are agreed upon the final disposition of the case.

While, as already stated, it is presumed that the bank stock was worth par, and judgment might properly be ordered upon that theory, still a majority of the court believe that it is fairer to remand the case and permit the parties to litigate the question of value. This, however, is the only question to be litigated, as it would be unfair to compel the parties to relitigate any of the other issues. The value of the stock is to be determined as of the date when the plaintiff placed it beyond its control and permitted it to be appropriated by Eric Stafne. Appellant is entitled to the statutory costs on appeal.

CHRISTIANSON, J. (concurring specially). I concur in a reversal and a remand of the case for the purpose of a trial upon the question of the value of the bank stock; but I do not concur in all that is said in the opinion prepared by Mr. Justice Grace, and I entirely disagree with him in so far as his views are at variance with the principle announced by this court in First Nat. Bank v. Meyer, 30 N. D. 388, 152 N. W. 657.

And, while I do not believe that the rule announced in First Nat. Bank v. Meyer, supra, is applicable to or involved in this case, I deem it proper to observe that that decision represents the deliberate judgment of this court as then constituted upon a question argued and deemed to be decisive of that case. The Negotiable Instruments Act was adopted by the different states to secure uniformity on the important subjects covered by the act. This being so, not only should the rule of *stare decisis* apply with full force, but great weight ought to be given to the harmonious decisions of other states, construing provisions of the act. Union Trust Co. v. McGinty, 212 Mass. 205, 98 N. E. 679, Ann. Cas. 1913C, 525. The principle announced in First Nat. Bank v. Meyer, supra, is sustained by the overwhelming, and practically unanimous, weight of judicial authority. See authorities cited in First Nat. Bank v. Meyer, supra. See also Union Trust Co.

v. McGinty, supra; German American State Bank v. Watson, 99 Kan. 686, 163 Pac. 637; Graham v. Shephard, 136 Tenn. 418, 189 S. W. 867, Ann. Cas. 1918E, 804; Niotaze State Bank v. Cooper, 99 Kan. 731, 162 Pac. 1169. The great unanimity with which courts in other states have announced and adhered to the rule, both prior to and subsequent to the decision in First Nat. Bank v. Meyer, is at least persuasive evidence that First Nat. Bank v. Meyer was decided correctly.

As already stated I do not believe that the rule announced in First Nat. Bank v. Meyer is at all involved in this case. It is true the plaintiff in its brief argues that the defendant is primarily liable, and cites First Nat. Bank v. Meyer, in support of its argument. But the defendant does not deny this, or question the correctness of First Nat. Bank v. Meyer. Neither does the defendant contend that he is discharged from liability upon the note by reason of plaintiff's surrender of the collateral security. On the contrary, defendant concedes liability on the note, and merely asks that the damages which he has sustained by reason of plaintiff's breach of contract be offset against the amount due on the note. In his brief defendant says: "This is a suit on a promissory note and the indebtedness is admitted in the answer, but there is a counterclaim for the value of the collateral security which the defendant says the plaintiff converted." And in defendant's reply brief the same proposition is most emphatically adhered to. He says: "We did not urge that the passive negligence of Hagen (the president of the plaintiff bank) when Stafne seized the stock, and his ratification of Stafne's forcible annexation of it, in face of Westby's warning, and in disregard of his duty as a bailee . . . *discharged* Westby. *We interposed plaintiff's conversion as a counterclaim and offset, not a defense.* We did not urge that the fact that Hagen permitted Stafne to take and keep twenty shares of bank stock of which he was trustee and which he was under legal duty to preserve with "at least ordinary care, discharged Westby. . . . We urged his neglect of duty as a bailee and his presentation of the stock to another as a counterclaim. . . . It is 'to the extent to which he is prejudiced' upon which the counterclaim is based." There should be no difficulty in understanding defendant's position. It could not have been stated more clearly and unequivocally.

The evidence shows that the original loan was made for $1,745.90.

It was evidenced by a promissory note for that amount signed by J. A. Stafne, dated August 8, 1911, payable November 1, 1912. The note was secured by collateral consisting of stock in the Williston State Bank of the par value of $2,500, and stock in the Citizens State Bank of Alexander of the par value of $2,000. The certificates in the latter bank were in the name of J. A. Stafne, but the certificates in the Williston State Bank were in the name of A. J. Stafne. The two Stafnes were brothers and both interested in the Citizens State Bank of Alexander. About two years thereafter the defendant Westby acquired the interest of John and Albert Stafne in the Williston State Bank Stock so pledged to and held by the plaintiff as collateral. Arrangements were made whereby the plaintiff bank agreed to release the Williston State Bank Stock in consideration of Westby's signing with Albert Stafne a renewal note for the amount of the principal and interest accrued on the original note. Such renewal note was executed by Westby. It bears date November 28, 1913. This latter note was renewed on March 25, 1914. It was again renewed on November 20, 1914, when the note involved in this action was executed. It is undisputed that Westby was not a party to the original transaction, and that the renewal notes included no consideration except the principal and accrued interest on the original loan. It is also clearly established that Westby executed the note dated November 28, 1913, with the absolute understanding that the $2,000 stock in the Citizens State Bank of Alexander would continue to be held by the plaintiff as collateral security, as well as with the assurances of Mr. Hagan that such stock furnished ample security for the payment of the indebtedness. It is also established that Westby executed the renewal note involved in this action, with the continued understanding that the bank stock should remain security as before. Thereafter the Citizens State Bank of Alexander got into financial difficulties, and the State Examiner required that John and Albert Stafne sever connections with the bank, and that $17,000 of notes of doubtful value be replaced. One Eric Stafne took the objectionable notes, and paid into the bank in place thereof $17,000 in cash. After this replacement had been made the plaintiff bank permitted the bank stock which it held as collateral security to come into the hands of Eric Stafne, and, after new certificates had been issued in his name, Stafne sold and transferred them to

others. The evidence leaves no room for doubt but that it was always the understanding of the plaintiff and defendant as well as of Eric Stafne that the bank stock should remain as collateral security for the note involved in his action.

While it is true that, "except where it is otherwise provided by statute or by agreement of the parties, the fact that plaintiff holds collateral security for the instrument sued on, which he has not resorted to or attempted to enforce, or which he has not returned, or that he has been so negligent in disposing of such collateral that the maker would have a cause of action against him therefor, is not a good defense to an action at law" (8 C. J. 802, 803), it does not follow that a defendant who has sustained detriment by the wrongful or negligent acts of the plaintiff in the disposition of such collateral is precluded from setting this up by way of counterclaim or set-off in an action on the note. The legal effect of the note, and the defendant's liability thereon, remain unchanged. These are not altered because the plaintiff has breached the obligation which it owed to the defendant with respect to the collateral security. "There is no such thing as setting up one right of action in bar of another right of action." Taggard v. Curtenius, 15 Wend. 155. But, as already stated, the defendant does not seek to set up plaintiff's breach of obligation as a defense to the note, but asks that the damages he has sustained by reason of plaintiff's negligent or wrongful acts be offset against the amount due on the note. Defendant's counterclaim or set-off is not an ingredient of, and in no manner affects the contract evidenced by, the note, whereby Westby agreed to pay the plaintiff a certain sum. Such counterclaim is predicated upon plaintiff's breach of the contract relating to the collateral held by it. Plaintiff did not preserve such collateral. And it is conceded that it is unable to deliver it to the defendant upon the payment by him of the note involved in this action. It seems clear that the plaintiff has breached the obligation which it owed to the defendant with respect to the collateral, and that for such breach of duty the defendant is entitled to recover the detriment which he has suffered; viz., the value of the collateral. See Ambler v. Ames, 1 App. D. C. 191, 196; Taggard v. Curtenius, supra; 22 Am. & Eng. Enc. Law, 899. See also Sykes v. Everett, 167 N. C. 600, 4 A.L.R. 751, 83 S. E. 585; Potter v. Tyler, 2 Met. 58, 63. This being so, there is

no reason why the defendant may not counterclaim or set off the damages which he has sustained in the action on the note. Emerson-Brantingham Co. v. Brennan, 35 N. D. 94, 159 N. W. 710.

I agree with Mr. Justice Grace with regard to the presumptive value of bank stock. And while it is true the evidence in this case shows that the bank involved in this action had been in financial trouble, it also shows that the orders of the examiner had been complied with, and it must be assumed that any impairment had thereby been made good.

In my opinion the evidence does not justify plaintiff's claim that the defendant either consented to or ratified plaintiff's disposition of the collateral. Nor can it be said that the defendant has waived, or is estopped from asserting, his counterclaim.

BRUCE, Ch. J. I concur in the above opinion by Mr. Justice CHRISTIANSON.

BIRDZELL, J. (concurring specially). I concur in the reversal of the judgment and in the order remanding the cause for the purpose of determining the damage sustained by the defendant caused by the surrender of and failure to regain the bank stock which was held by the plaintiff as collateral to the note in suit. I can see no occasion, however, for construing any section of the Negotiable Instruments Law in deciding this case. The only question arises upon the counterclaim, and the counterclaim is based upon the right of a surety to recover damages where the creditor has allowed securities available to him to become dissipated. So far as I can discover from a careful reading of the Negotiable Instruments Law, it contains no provision which could possibly have any bearing upon the right of the defendant to counterclaim his damages unless it be the provision § 7080 of the Compiled Laws of 1913, which provides that "in any case not provided for in this chapter, the rules of the law merchant shall govern." The right of a surety to be compensated for damages in such cases as the one at bar is so well established in both the common law and the law merchant that authorities need not be cited in support of the proposition.

In my judgment there is no occasion here to refer to the doctrine

of First Nat. Bank v. Meyer, 30 N. D. 388, 152 N. W. 657, nor to express any opinion concerning the correctness of that decision. In that case there is much discussion as to the effect of an agreement between the principal debtor and the creditor extending the time of payment without the consent of the surety and without a reservation of the rights against the surety. It appears that the counsel for the respective parties considered that the case was controlled by certain sections of the Negotiable Instrument Law, and that the case was decided upon the theory presented and argued. Reference to the facts in that case, however, will disclose that there was no agreement between the principal debtor and the creditor extending the time of payment. On the contrary, the defendant surety predicated his damages wholly upon the claim that a judgment in the plaintiff's favor against a garnishee had been compromised to his detriment.

Notwithstanding the degree of similarity between the facts in the Meyer Case, supra, and the case at bar, it seems to me to be clear, as it is to the majority of the court, that this case does not involve the effect of an agreement between a creditor and a principal debtor extending the time of payment. Nor does it involve any proposition analogous to that. Inasmuch as the counterclaim does not rest upon any right which is either defined or qualified by the provisions of the Negotiable Instrument Law, I can, as indicated above, see no occasion for referring to previous constructions of the various sections of the law. It is for this reason that I express no opinion upon one of the propositions discussed in the opinion of Judge Grace, and which is further discussed, with contrary conclusions, in the opinion of Judge Christianson. I concur in the result because of the inexcusable failure of the plaintiff bank to realize upon the security which, as between it and the defendant surety, it was bound to apply to the payment of the obligation. The defendant's damages are properly measured by the value of the stock at the time the bank should have asserted its claim thereto as against Eric Stafne.

ROBINSON, J. (dissenting). Defendant Simon Westby appeals from a judgment against him on a promissory note. The defense is a counterclaim based on an alleged conversion of twenty shares of bank stock

which was collateral security. Hence, the burden of proof is on the defendant.

On November 20, 1914, defendant for value received made to plaintiff a promissory note for $2,320.64, with interest at 8 per cent. There is no claim that the note has been paid. It was given in renewal of a debt secured by prior notes. The debt was secured by twenty shares of stock in the Citizens National Bank of Alexander, North Dakota, which stock was in the name of A. J. Stafne. As the trial court found the bank of Alexander became insolvent, went into the hands of the bank examiner, who demanded that A. J. Stafne transfer said twenty shares of capital stock to his father, Eric Stafne. Accordingly, on November 28, 1913, at Williston, with the assent or at the request of Simon Westby, the plaintiff delivered said twenty shares of stock to A. J. Stafne. He was then the vice president of the Williston State Bank and defendant was the president. The stock was delivered to Stafne that he might take the same to the Bank of Alexander, as reorganized for renewal, replace the same by renewal stock. But Stafne failed to return to the plaintiff bank any renewal stock, and thus it was left without the collateral, which was really worthless; and, with full knowledge of the facts, the defendant made the said renewal note in suit, on which the plaintiff has never received a penny. That is all there is of the case.

The findings and the judgment are clearly right, and it should be affirmed.