(No. 5944. November 19, 1932.)

INTERMOUNTAIN TITLE GUARANTY COMPANY, a Corporation, Appellant, v. GEORGE L. EGBERT and GWEN EGBERT, His Wife, H. CARL NIELSON, as Administrator of the Estate of HYRUM NIELSON, Deceased, and E. L. CHESNEY, Respondents.

[16 Pac. (2d) 390.]

Stewart, Alexander & Budge and Merrill & Merrill, for Appellant.

Peterson & Clark and L. R. Morgan, for Respondents.

GIVENS, J.—Hyrum Nielson, of Preston, subscribed for fifty shares of common stock of the Intermountain Title Guaranty Company prior to incorporation, paying $125 cash and giving his note for $375. Thereafter he subscribed for twenty shares of common at $10 per share, and twenty shares of preferred at $115 per share, paying $625 in Liberty bonds, and giving his note for $1,875 for the balance. One Keller, who handled both subscriptions, indorsed on the back of the contract that Nielson might "drop one or five shares of his preferred stock which

carries with it one-share of common stock," and on the back of the $1,875 note:

"This note is payable on demand to Nephi L. Morris, Trustee, by mortgage acceptable to Nephi L. Morris, Trustee.
"(Signed)    FRANK KELLER."

Such notes and contract were delivered to Morris, trustee for the prospective corporation, which was incorporated on February 24, 1928.

February 29, 1928, Nielson delivered to Morris, as security for his obligation, a promissory note, mortgage and assignment of mortgage, given him by respondents Egbert, and Morris marked the $1,875 note paid, and indorsed a credit of $125 on the $375 note, leaving a balance due of $250, which amount Nielson paid August 4, 1928, and the stock for which he had subscribed was delivered to him in Preston.

Nielson made interest payments of about $200, and later asked to be allowed to drop the stock as provided in the subscription agreement, stating that if allowed to do this, he would pay the interest due. This request was refused as coming too late.

April 22, 1931, Nielson entered a release of the Egbert mortgage at the recorder's office in Preston, such release coming to plaintiff's attention about June 2, 1931. Plaintiff immediately brought action to have the release vacated and for foreclosure of the mortgage. The defense was failure of the company to comply with C. S., chap. 206, the Blue Sky Law; the agreement to cancel the stock was set up; Egberts alleged that the Nielson note and mortgage were given without consideration, and were void.

Nielson cross-complained, asking for judgment for $625 paid in Liberty bonds, and $200 paid in interest, and further asked that he be allowed a credit of $525 for five shares of stock he claimed he had elected to drop, in the event judgment was for plaintiff.

Judgment was awarded for defendants for the return of the mortgage and note and for $1,200, the total cash paid by Nielson. Plaintiff appeals from such judgment.

Four major issues are presented in this case: First, does the Blue Sky Law apply to plaintiff and its predecessor promoters; second, were the negotiations in Idaho such as to come under the ban of the Blue Sky Law; third, was the substituted note and mortgage on which this suit is based tainted with the irregularity of the preceding notes and transactions; and last, may respondent recover the money paid in connection therewith.

Appellant asserts that at the time of the alleged "negotiations for sale" of the stock in question it was not an investment company as defined by C. S., sec. 5305. This statute provides:

"Definition of Investment Companies. Every corporation, every copartnership or company, and every association (other than state and national banks, trust companies, real estate mortgage companies dealing exclusively in real estate mortgage notes, and corporations not organized for profit), organized or which shall be organized in this state, whether incorporated or unincorporated, which shall sell or negotiate for the sale of any stocks, bonds or other securities of any kind or character other than bonds of the United States, the State of Idaho, or of some municipality of the State of Idaho, and notes secured by mortgages on real estate located in the State of Idaho, to any person or persons in the State of Idaho, other than those specifically exempted herein, shall be known for the purpose of this chapter as a domestic investment company. Every such investment company organized in any other state, territory or government, or organized under the laws of any other state, territory or government, shall be known for the purpose of this chapter as a foreign investment company."

It is conceded that appellant was not organized as a corporation at the time of the conversations had with Nielson by Watson and Barnett in Preston, and appellant urges that at that time it was not a copartnership, company or association, so as to come within the meaning of the act.

Nephi L. Morris was trustee and custodian of the funds, notes, etc., for the corporation prior to its incorporation, and

was associated with the other promoters (Keller, Watson and Barnett), in obtaining the subscription contracts. Keller apparently had charge of the contracts and sale of stock, and Watson and Barnett were his agents who contacted the public and solicited the contracts. The subscription contract showed the purpose and intent of the promoters of the corporation, thus:

" . . . . WHEREAS it is proposed to organize under the laws of the State of Utah a corporation to be known as INTERMOUNTAIN TITLE GUARANTY COMPANY, or by such other name as the parties in interest may determine; said corporation to have a capital stock of Thirty Thousand (30,000) shares, divided into Twenty Thousand (20,000) shares of common stock, without par value, and Ten Thousand (10,000) shares of preferred stock of the par value of Fifty Dollars ($50.00), the said preferred stock to be offered for sale at One Hundred Fifteen Dollars ($115.00) per share, and the purchase of each share of the preferred stock of said price shall entitle the purchaser to purchase one share of common stock at $10.00 per share.

"WHEREAS it is proposed that said corporation shall transact business as follows:

" . . . . (c) The business of selling or mortgaging real estate or personal property, loaning money on real estate security, or otherwise, selling and assigning mortgages, endorsing negotiable instruments, and executing and delivering bonds, treasury notes and bills of exchange, and such other lines of business as are permitted to said corporations by the laws of the State of Utah.

" . . . . Now therefore the subscribers hereto, in consideration of their mutual promises, do hereby severally agree to and with each other that they will take and pay for, and they do hereby severally subscribe to the capital preferred stock of said corporation to the number of shares as is set opposite their names, and agree to pay for such stock upon demand.

"It is understood that the subscriptions to said stock are made by the undersigned upon the conditions that:—

"Whereas the law of the State of Utah requires that said company proposed to be organized shall have a paid up cash capital of not less than One Hundred Thousand Dollars ($100,000), in order to do business in the State of Utah; therefore all moneys received on subscriptions, for both common and preferred stock, less the commission paid thereon, shall be placed in trust with the Utah Savings & Trust Company, of Salt Lake City, Utah, until the amount of One Hundred Thousand Dollars ($100,000) to be used as capital, is received on said subscriptions, said money to be thereafter placed on deposit by the corporation, as required by law.

"It is further agreed that upon the organization of said corporation, Frank Keller, of Salt Lake City, Utah, shall be appointed fiscal agent for the corporation and authorized to sell the capital stock thereof. Frank Keller shall be paid such commission, upon all subscriptions received, both before and after incorporation, as may be permitted by the Utah State Securities Commission."

█ In their joint activities they were associated for this common purpose, and did exactly what the statutes were designated to regulate, control or prevent.

The appellant accepted the fruits and benefits of the promoters' efforts, and thereby ratified their activities and arrangements, and it may not now plead *mea non culpa.* (*Henry Gold Min. Co. v. Henry*, 25 Ida. 333, 137 Pac. 523.) In *Mantle v. Jack Waite Min. Co.*, 24 Ida. 613, 637, 135 Pac. 854, 136 Pac. 1130, the court said:

"So far as the action of the promoters is concerned, in promoting the transaction and the organization of the corporation and the sale of the property, it is clear from the evidence that the corporation by its acts ratified all of the arrangements of the promoters, and that the contract was intended to inure to the benefit of the future corporation when organized, and that the corporation ratified and affirmed the contract and accepted the benefits and conditions of the acts and contract of the promoters and accepted the

sale of the property made by Mantle to the corporation under the contract made by the promoters and Mantle.''

These parties were therefore sufficiently associated together to come within the purview of C. S., sec. 5305. (*Felton v. Highlands Hotel Co.,* 165 Ga. 598, 57 A. L. R. 987, 141 S. E. 793; *National Bank of the Republic v. Price,* 65 Utah, 57, 234 Pac. 231; 4 Fletcher, Cyc. Corp., sec. 1450, p. 123; 14 Fletcher, Cyc. Corp., sec. 6747, p. 151.)

*Planters' Warehouse Co. v. Sentelle,* 148 Tenn. 353, 255 S. W. 589, cited by counsel, is distinguished in *Reed v. Appleby,* 150 Tenn. 63, 262 S. W. 35, 36, wherein the conditions were similar to those herein. Furthermore, *Planters' Warehouse Co. v. Sentelle, supra,* held that the organization was not engaged in business comprehended by the regulatory act, not that it was immune because selling prior to incorporation. (See, also, *Goodyear v. Meux,* 143 Tenn. 287, 228 S. W. 57.) *Decke v. Baker,* 201 Mich. 608, 167 N. W. 908, did not involve the Securities Act or Blue Sky Law.

To hold that promoters might sell or negotiate for the sale of stock in a corporation later formed, and such corporation issue stock on the basis of such sales, were not an association within the ban of the statute, would be a mere quibble and subterfuge to defeat the evident purpose of the act. (*Efland v. Southern Ry. Co.,* 146 N. C. 135, 59 S. E. 355; *Singer Mfg. Co. v. Wright,* 97 Ga. 114, 25 S. E. 249, 35 L. R. A. 497; *Singer Mfg. Co. v. Wright,* 33 Fed. 121; *Lowther v. Bridgeman,* 57 W. Va. 306, 50 S. E. 410; *Keystone Pub. Co. v. Hill Dryer Co.,* 55 Misc. Rep. 625, 105 N. Y. Supp. 894.)

Watson and Barnett, the agents of Keller, who had charge of the sales of stock, came to the home of Nielson in Preston and had several conversations with him in regard to the stock. It is asserted, however, that they did not ''sell or negotiate for the sale of any stocks, bonds or other securities'' within the meaning of C. S., sec. 5305. Appellant urges that Watson and Barnett merely went to Preston to ''interest'' Nielson in the stock, and that the sales and negotiations for sales were made in Salt Lake. It appears

that the notes were all signed and the stock mailed to Nielson from Salt Lake, it being conceded that there was no completed sale of stock in Idaho.

It is incumbent upon this court to give a statute an interpretation which will not nullify it if such construction is reasonable or possible. (*State v. Omaechevviaria*, 27 Ida. 797, 152 Pac. 280; *Smallwood v. Jeter*, 42 Ida. 169, 244 Pac. 149; *Hamilton v. Swendsen*, 46 Ida. 175, 267 Pac. 229; *Gallafent v. Tucker*, 48 Ida. 240, 281 Pac. 375; *State v. Holder*, 49 Ida. 514, 290 Pac. 387; *Diefendorf v. Gallet*, 51 Ida. 619, 10 Pac. (2d) 307.)

The narrow construction placed upon "negotiate for sale" by appellant is repugnant to the broad scope and protective purpose of the statute, and such construction by this court would nullify the safeguards provided by the act. To hold that "negotiate for sale" requires that the final steps be taken would be to ignore the preliminary steps, which by all definitions (*Clarke v. Blackfoot Water Works*, 39 Ida. 304, 310, 228 Pac. 326) are an essential part of the connotation of the word, i. e., "The total of the qualities constituting the significance of a term." (Standard Dictionary.) This, appellant's own authorities recognize and state: *Allen & Holmes v. Powell*, 125 Ga. 438, 54 S. E. 137, 138, which says:

"Negotiations is a very broad term. It embraces everything from the *first approach* of the one who desires to purchase to the one from whom the purchase is to be made to the final consummation of the contract of purchase." (Italics ours.)

See, also, *People v. Augustine*, 232 Mich. 29, 204 N. W. 747.

The act itself recognizes the difference between completed and incomplete transactions by saying: "which shall sell," meaning the completed sale, which of necessity includes everything going before, and "negotiate for sale," which evidently signifies the steps leading up to a sale. The conclusion is inescapable that there was a "negotiation for sale" in connection with the transaction in question. (*Rhines v. Skinner Packing Co.*, 108 Neb. 105, 187 N. W. 874; *Groby v. State*, 109 Ohio St. 543, 143 N. E. 126, 128; *Cameron v.*

*Ayres,* 175 Cal. 662, 166 Pac. 801; *Everson v. General Acc. Fire & Life Assur. Corp.,* 202 Mass. 169, 88 N. E. 658; *Northrup v. Diggs,* 128 Mo. App. 217, 106 S. W. 1123; 45 C. J., pp. 1374–1376.)

■ A renewal of a voidable note does not validate or remove the stigma, at least between the original parties as herein, resting on the original obligation. If Nielson is not liable, the Egberts cannot be; otherwise it would amount herein in effect to a nullification of the Blue Sky Law. Appellant was not an innocent purchaser as to Nielson or the Egberts, and the Egberts were only liable as security on Nielson's debt if valid (herein held invalid), and if Nielson is not liable to appellants, neither are the Egberts. (*Armstrong v. Walker,* 200 Ala. 364, 76 So. 280, 281; *City National Bank v. De Baum,* 166 Ark. 18, 265 S. W. 648; *International Harvester Co. v. Thomas,* 43 N. D. 199, 176 N. W. 523.)

Many cases cited by appellant have to do with fraud, in instances where it may be waived, and which are not in point herein.

Estoppel was not plead as a defense, so is not in the case. (*Anthon State Bank v. Bernard,* 194 Iowa, 1090, 191 N. W. 283.) Nor is it shown that appellant was placed in a worse position by the renewal. (*Scandinavian American Bank v. Westby,* 41 N. D. 276, 172 N. W. 665.)

■ The authorities cited by respondent amply support the proposition that money paid for stock sold in violation of the Blue Sky Law may be recovered. (*Reilly v. Clyne,* 27 Ariz. 432, 40 A. L. R. 1005, 234 Pac. 35; *Barrett v. Gore,* 88 Cal. App. 372, 263 Pac. 564; *Pennicard v. Coe,* 124 Or. 423, 263 Pac. 920; *Rhines v. Skinner Packing Co., supra; Karamanou v. H. V. Greene Co.,* 80 N. H. 420, 124 Atl. 373; *Thompson v. Cain,* 226 Mich. 609, 198 N. W. 249; *Farm Products Co. v. Jordan,* 229 Mich. 235, 201 N. W. 198.) Appellant has presented no authorities to the contrary.

Judgment affirmed; costs to respondents.

Lee, C. J., Varian and Leeper, JJ., and Babcock, D. J., concur.