PEOPLE v. AUGUSTINE.

1. LICENSES—"BLUE SKY LAW"—NEGOTIATION IN THIS STATE CONSTITUTES OFFENSE ALTHOUGH NO SALE CONSUMMATED.

The offense of violating the "blue sky law" (3 Comp. Laws 1915, § 11958, as amended by Act No. 404, Pub. Acts 1921) is complete if negotiations be had in this State to sell stock without complying with the provisions of the statute, and it is immaterial that no sale was consummated or that it was to be consummated in some other State.[1]

2. SAME — TRIAL—INSTRUCTIONS—"NEGOTIATE"—"PROMOTE"—ACTS TENDING TO PROMOTE SALE OF STOCK MAY BE NO OFFENSE.

In a prosecution for violating the "blue sky law," an instruction to the jury by the trial judge after properly defining the word "negotiate," that, "as used in this act, * * * negotiate includes * * * such acts as tend to promote the sale of stock," was reversible error, in view of the fact that there was evidence of a public talk by defendant which would tend to promote the sale of the stock, but would not constitute negotiation for its sale.[2]

[1]Licenses, 37 C. J. § 172 (Anno); [2]Criminal Law, 17 C. J. § 3688; Licenses, 37 C. J. § 172.

Exceptions before judgment from Eaton; McPeek (Russell R.), J.    Submitted June 11, 1925.    (Docket No. 91.)    Decided July 16, 1925.

Benjamin F. Augustine was convicted of violating the "blue sky law."    Reversed.

*Rosslyn L. Sowers* and *Burritt Hamilton,* for appellant.

*Andrew B. Dougherty,* Attorney General, *Carl D. Mosier,* Assistant Attorney General, *C. B. Fisk Bangs,* Prosecuting Attorney, and *Claud J. Marshall,* Assistant Prosecuting Attorney, for the people.

SHARPE, J.    Defendant reviews his conviction on exceptions before sentence of a violation of section 14 of Act No. 46, Pub. Acts 1915 (3 Comp. Laws 1915, § 11958), as amended by Act No. 404, Pub. Acts 1921 (Comp. Laws Supp. 1922, § 11958), which provides that:

"It shall be unlawful for any investment company or dealer, or representative thereof, either directly or indirectly, to sell or cause to be sold, offer for sale, take subscriptions for, or negotiate for the sale in any manner whatever in this State,. any stocks, bonds or other securities except as expressly exempted herein, unless and until said commission has approved thereof and issued its certificate in accordance with the provisions of this act."    *    *    *

The gist of the information is that defendant,—

"who was then and there a dealer    *    *    *    did then and there negotiate for the sale to the complainant and divers other persons to the complainant unknown, of stocks of a certain company known and designated as the Augustine Automatic Rotary Engine Company,"—

without having complied with the provisions of the statute requiring the obtaining of a certificate of ap-

proval of such stocks from the securities commission.

The Augustine company is a New York corporation, having its office and factory in the city of Buffalo. Defendant is its president. Sale of its stock had not been authorized in this State. Henry A. Goodrich, of Charlotte, had purchased some stock in 1911 in a company organized by Augustine. In the summer of 1921, Goodrich received a letter from Augustine. Accompanied by four residents of Charlotte, he went to Buffalo. They looked the plant over. They did not see Augustine. After their return, Augustine wrote Goodrich, who again went to Buffalo, accompanied by five of the business men of Charlotte. They looked over the factory and the motor. He gave them some booklets descriptive of the engine. He told them that the stock was all disposed of except 1,000 shares, which had been retained for stockholders of the old company, of which Goodrich was one. They brought some literature and blank applications back with them. A number of applications were made and forwarded by Goodrich, and the stock certificates sent direct to the subscribers.

On October 26, 1921, Augustine came to Charlotte. He had a model of his engine, which he demonstrated to several persons. In the evening, he addressed a meeting, called, however, without his knowledge, at which he explained his rights under his patent, told about his plant and the orders which had been received.

The particular incidents relied on by the prosecution to prove a violation of the law by defendant are thus stated by the prosecution in its brief:

"Mr. S. E. Cook of Charlotte on October 26th went into Goodrich's store to purchase one share of stock. Mr. Augustine was there in the room when he made his application; Goodrich told him that he did not know whether he could let him have the stock or not, that he would check up. Goodrich informed Augustine of

Mr. Cook's desire and told Augustine that the stock was over-subscribed. Augustine said: 'Well, I will tell you Mr. Goodrich, you can let one hundred shares more go, but no more until I get to Buffalo and make arrangements.' Mr. Goodrich took Mr. Cook's subscription that same day.

"Joseph D. Powers of Charlotte saw Mr. Augustine in the front room of Goodrich's store and afterwards had a talk with him in the back room. He advised Augustine that he desired to purchase some stock, but did not have the money to put into it at that time. He made a proposition to purchase stock on a partial payment plan. Augustine talked over this proposition with Powers and informed him that he might take it up with the board of directors and let him know, which he did. Powers had some correspondence with Mr. Augustine and received a letter stating that his proposition would be accepted. Powers made application on blanks obtained from Goodrich for ten shares of stock and made the first payment of $27. He received a contract and credit for his payment. The contract sent from Buffalo provided for monthly payments of $27 'which was the same amount talked over in the back room of Goodrich's store' between Powers and Augustine on October 26th."

There was proof tending to show that Augustine appointed Goodrich an agent of the company to sell its stock and that he was afterwards paid a commission of $4,000, or more, for doing so. One hundred fifty-seven subscribers were listed in the book of sales kept by him.

1. Counsel differ as to the construction which shall be placed on the language of the statute. The defense insist that to constitute an offense it must be shown that defendant negotiated *for the sale of stock in this State,* while the prosecution contend that if the negotiation be had *in this State* it is immaterial that the sale was to be consummated in some other State.

The statute prohibits the sale by any person himself, or by others acting for him, the offering for sale, the taking subscriptions for or the negotiating for a sale

in any manner whatever. The words "in this State" which follow would seem to apply with equal force to any of the acts which are prohibited. The statute has no application to acts performed without the State. It seeks to protect the citizens of this State in their investments by providing that securities offered for sale to them must first be approved by the commission. If it be charged that an unlawful sale has been made, it must appear that the sale was made in this State. If, however, the charge be that securities not approved by the commission were offered for sale, the fact that the sale was not completed within the State would be immaterial. The unlawful act was the "offering for sale." If it was committed within the State, it would be immaterial whether it was intended that the sale would be finally consummated in this or some other State. The same reasoning, we think, applies to the act of negotiating for the sale of such securities. Such a negotiation is prohibited by the statute. The offense is committed when the negotiation is had, even though no sale be consummated as a result thereof. The purpose of this provision is to prevent the citizens of the State from making investments in unapproved securities by inducements held out to them by those interested in the sale thereof. The negotiation must, of course, be conducted in this State. Liability for a violation of the provision may not be evaded by arranging that the subscription secured as a result of the negotiation is to be sent by the subscriber to a place without the State and the sale consummated by the mailing of the stock to him.

2. In his instructions to the jury the court said:

"Now, going to the meaning of the word negotiations as contained in this statute. Negotiation is that deliberation which takes place by the parties touching a proposed agreement. It means to treat with another or others, to arrange for or procure by discussion or

232—Mich.—3.

bargaining. The term is sometimes used as meaning to discuss or arrange for sale or bargain, or the preliminaries of a business transaction. It means also to converse in arranging the terms of a contemplated contract. Negotiate, as defined by Webster, is to transact business, to treat with another respecting a purchase and sale, to hold intercourse, to bargain or treat, to conduct communications or conferences. It is that which passes between parties or their agents in the course of or incident to the making of a contract; and is also defined as conversation in arranging the terms of a contract. As used in this act, I instruct you that the word negotiate includes every act of the defendant, done directly or indirectly, which has for its ultimate purpose the sale of stock of the company; *in other words, such acts as tend to promote the sale of stock.*"

Error is assigned upon the language used in the last sentence of the quotation. It is insisted that by saying "As used in this act," after having defined the word "negotiate" generally, the jury were given to understand that it had a different meaning as here used from that which had been theretofore stated. Followed as it was by saying that it includes "such acts as tend to promote the sale of stock," we are impressed with the force of counsel's contention. After having deliberated for some time, the jury returned into court, and one of them said to the judge:

"In regard to the negotiating for stock. Some of the boys don't understand the definition of that word, and what constitutes negotiation for stock."

The instruction as above quoted was then read to them.

It must be assumed that the legislature used the word "negotiate" in the sense and with the meaning ordinarily understood when applied to the matter under consideration. This the court had correctly stated. The word "promote" is defined by Webster: "To contribute to the growth, enlargement, or prosperity of;

to forward; to further; to encourage; to advance." In order to negotiate with another, there must be a purpose to bring about a purchase or sale, or to arrive at some kind of an understanding, bargain or agreement.

At the time of defendant's visit, there was talk about the establishment of a branch factory at Charlotte to manufacture the motors. In this the people of that city would naturally take much interest. The address delivered by the defendant at the meeting, which was attended by a considerable number of citizens, would have a tendency to interest the people in the company and thereby "tend to promote the sale of stock." Its delivery, however, was not a negotiation by the defendant with those present for the sale of stock to them. We are impressed that the jury may have so understood. The testimony is in conflict as to what the defendant said to those with whom it is claimed that he negotiated. We feel constrained to hold that the instruction given constitutes reversible error.

The conviction is set aside, and a new trial granted.

McDONALD, C. J., and CLARK, BIRD, MOORE, STEERE, FELLOWS, and WIEST, JJ., concurred.