## Commonwealth v. Safe Harbor Water Power Corporation

*Ballard, Spahr, Andrews & Ingersoll,* for appellant.
*Anne X. Alpern,* Attorney General, for Commonwealth.

HERMAN, J., September 21, 1964.—The case before us is the appeal of Safe Harbor Water Power Corporation (hereinafter called Safe Harbor or appellant), from the action of the Board of Finance and Revenue sustaining the resettlement of appellant's Corporate Net Income Tax for the year 1955.

All of the facts were stipulated by the parties and there was duly filed an agreement in writing to dispense with a trial by jury pursuant to the provisions of the Act of April 22, 1874, P. L. 109, 12 PS §688.

We adopt as part of our findings of fact the facts as stipulated by the parties and will hereinafter set forth in some detail those facts which we consider essential to the understanding of our decision.

From the stipulation of facts it appears that appellant is a Pennsylvania corporation incorporated in 1929 by a merger or consolidation of two constituent corporations, and all of the capital stock of appellant was then owned by two other corporations; namely, one that later became Baltimore Gas & Electric Company (hereinafter called the Baltimore company), and the other which later became the Pennsylvania Power & Light Company (hereinafter called the Pennsylvania company).

In 1927, when the majority of the stock interest of both the Baltimore company and the Pennsylvania company was owned by J. E. Aldred, who was then a partner in the New York investment banking firm of Aldred & Company and also chairman of the board of both the Baltimore and Pennsylvania companies, a long-term contract between the two companies provided for the sale of all of the hydro-electric output of the Pennsylvania company to the Baltimore company; both companies being then engaged in the generation, purchase, and sale of electric power and energy. The Pennsylvania company owned and operated a plant on the Susquehanna River below Safe Harbor and the

Baltimore company was in the same business in Baltimore, and elsewhere in Maryland.

In 1931, after appellant was formed as we have indicated, it constructed *its* generating facilities on the Susquehanna at Safe Harbor not far from the plant of the Pennsylvania company.

While this plant was under construction appellant entered into an agreement with the Pennsylvania company and the Baltimore company providing for the sale, until the year 1980, of two-thirds of the output of this generating plant to the Baltimore company and one-third to the Pennsylvania company. The agreement further provided that the electric energy for the Baltimore company would be delivered to points in the Baltimore area and the electric energy for the Pennsylvania company would be delivered at Safe Harbor. But at the same time and by mutual agreement of all three companies, the Pennsylvania company then undertook to deliver the Baltimore company's two-thirds purchase to the Baltimore area over Pennsylvania company lines at the expense of the Baltimore company; so that as far as appellant was concerned all of the energy produced was delivered to the purchasers in Pennsylvania.

Another agreement was then entered into between the Baltimore and Pennsylvania companies continuing the sale to the Baltimore company of all of the *Pennsylvania* company's hydro-electric output from its generating plant *below* Safe Harbor; and providing also for the sale to the Baltimore company of the Pennsylvania company's one-third of *appellant's* output.

All three companies, from 1931 until August 1955, maintained their principal offices in Baltimore, Maryland, in the same building. Until August of 1955, appellant had no executive or administrative office in Pennsylvania; its employes in Pennsylvania prior to this time consisting of construction, operating, and

maintenance personnel. The executive direction of appellant was vested in its officers, all of whom had their offices in Baltimore or New York City. All legal, purchasing, budgeting, engineering, financial, accounting, billing, tax, insurance, and other administrative functions of appellant were performed in Baltimore.

In 1939 an agreement provided for the erection by appellant of another generating unit at Safe Harbor.

Appellant registered with the State of Maryland as transacting in that State *only* interstate business, and thus not subject to Maryland income tax law.

In 1948, the Pennsylvania and Baltimore companies, which until then had been closely associated and both of which were closely allied with appellant, became involved in litigation which continued until June of 1955. At that time a new agreement between the three companies was executed and appellant entered into a separate agreement with the Stone and Webster Service Corporation of New York, a management company.

The new agreement which superseded the earlier one between the three companies, also provided for the sale of two-thirds of appellant's output of electric energy to the Baltimore company, to be transmitted to the latter by the Pennsylvania company, and one-third to the Pennsylvania company, and to continue until 1980.

Although this agreement was negotiated over a period of years before it was finally executed, appellant had no particular interest in its outcome because the negotiation concerned only the division of the energy between the Pennsylvania company and the Baltimore company. It had always been agreed and understood that between the two companies they would, at least until 1980, take all of the energy appellant produced and, because of an order of the Federal Power Commission, they would pay for this energy a fixed and

nonnegotiable price which would yield to appellant a rate of return of five percent on its rate base.

Stone and Webster under its contract with appellant agreed to supply appellant with certain key executives and to furnish them with offices in New York City for $55,000 for the first year and $45,000 per year thereafter; $20,000 of which was to be for salaries of these executives and $2,000 for office rent in New York. For the balance of 1955, $32,499.42 was paid, of which $11,666.69 was for these salaries. Appellant also paid $73,895.18 for salaries in Baltimore in 1955, making a total paid for salaries outside of Pennsylvania of $85,-561.87.

On April 11, 1956, appellant filed its 1955 Corporate Net Income Tax Report in which it reported net income to be allocated of $1,791,848.56; an allocating percentage of .628907672; net income allocated to Pennsylvania therefor of $1,126,907.31; and a tax thereon of $56,345.37.

In this report appellant excluded from the numerator of the wages and salaries fraction the wages and salaries assignable to Maryland and New York in the total amount of $85,561.87, and excluded from the numerator of the gross receipts fraction $3,752,978.40, which was substantially the income derived from the sale of electric energy to the Baltimore and Pennsylvania companies.

The taxing officers of the Commonwealth settled this tax liability in the amount of $89,571.55, arriving at this figure by accepting appellant's tangible property fraction, but denying the other two fractions, and considering that *all* wages and salaries and *all* gross receipts were assignable to Pennsylvania.

Thereafter, on a petition for resettlement, the taxing officers of the Commonwealth resettled appellant's tax liability in the amount of $86,006.22, arriving at this figure by again accepting appellant's tangible

property fraction and, now, by also accepting its wages and salaries fraction, but still considering that *all* gross receipts were assignable to Pennsylvania.[1]

A petition for review filed with the Board of Finance and Revenue was refused and an appeal was taken to this court. On appeal the Commonwealth *now* contends that all of appellant's net income is taxable in Pennsylvania and that no allocating percentages are proper in this case on the theory that the entire business of the company was transacted within this Commonwealth. Appellant contends that its entire business is not transacted in Pennsylvania and, in fact, that the bulk of its gross receipts are not assignable to this Commonwealth, and it additionally contends that the settlement in this matter was not timely.

Concerning the matter of the timeliness of settlement, and incidentally the notification thereof to appellant, the following dates are pertinent: on April 15, 1956, the 1955 Corporate Net Income Tax Report of appellant was received by the Commonwealth; on November 18, 1958, the tax was settled and approved by the auditor general; on February 18, 1959 the settlement was mailed to appellant.

---

[1] The three positions; i.e., the taxpayer's, the settlement, and the resettlement, are graphically illustrated as follows:

| Fractions | As Reported & Claimed by Taxpayer | As Settled | As Resettled |
|---|---|---|---|
| Tangible | 25,051,933 | 25,051,933 | 25,051,933 |
| Property | 25,069,452 | 25,069,452 | 25,069,452 |
| Wages and | 631,135 | 716,697 | 631,135 |
| Salaries | 716,697 | 716,697 | 716,697 |
| Gross | 25,540 | 3,752,978 | 3,752,978 |
| Receipts | 3,752,978 | 3,752,978 | 3,752,978 |
| Allocating decimal | .628907672 | .999767 | .959972 |
| Amount of tax | $56,345.37 | $89,571.55 | $86,006.22 |

Taking up the question of the timeliness first, we find that section 8 of the Corporate Net Income Tax Act of May 16, 1935, P. L. 208, as amended, 72 PS §3420h, provides, in part:

"(a) All taxes due under this act shall be settled by the department, and such settlement shall be subject to audit and approval by the Department of the Auditor General, and shall, *so far as possible*, be made so that notice thereof may reach the taxpayer before the end of a year after the tax report was required to be made." [2]

"So far as possible" the tax settlement shall be made so that notice thereof may reach the taxpayer before the end of a year after the tax report was required to be made. In the instant case the tax report was received on April 15, 1956, the last day for filing, and the settlement was made November 18, 1958, two years and seven months later; or a year and seven months after the end of the year in which the report was filed. The Commonwealth contends that this delay is not sufficient to invalidate the settlement.

The section of the Corporate Net Income Tax Act just quoted is very similar to section 801(b) of The Fiscal Code, 72 PS §801(b), and these sections have been construed by this court in a number of cases.

Initially, Judge Kreider, speaking for this court, in Commonwealth v. Allied Building Credits, Inc., 65 Dauph. 401 (1953), affirmed 385 Pa. 370 (1956), held that where more than *seven* years elapsed after the filing of the report and there was *no* evidence of any fact indicating that it was not possible for the Commonwealth to settle the tax so that notice thereof would reach the taxpayer before the end of a year after the tax report was required to be made, that in that situation the settlement was null and void.

---

[2] Emphasis ours throughout unless otherwise indicated.

This decision was followed by a number of others in this court in all of which the delay was held to be reasonable when some facts were presented to excuse the late settlement. In the case of Commonwealth v. Fruehauf Trailer Co., 20 D. & C. 2d 30, the delay was caused by the accepted practice of the taxing authorities of "pairing" the tax reports of prior years with those of the current year, not only the reports for the same tax but also the comparison of reports of different corporate taxes.

In the case of Commonwealth v. Dresser Industries, Inc., 75 Dauph. 111 (1960), it was recognized that there may also be a need to pair the tax returns of the taxpayer with those of a subsidiary and that the parent tax could not reasonably be settled until there had been a tax settlement of the subsidiary's return. In Commonwealth v. Andale Co., 75 Dauph. 250 (1960), the court reached the same conclusion.

In Commonwealth v. Lehval Industries, Inc., 75 Dauph. 254 (1960), it was found that an "investigation into the company's system" was a factor which could justify delay.

Judge Neely, the late President Judge of this court, in Commonwealth v. Pa. Mfgrs. Ass'n Casualty Ins. Co., 78 Dauph. 28, 32 (1961), after pointing out that this court had, in the cases we have here mentioned, held that the time element for settlement of these tax reports would not apply where it appeared to be unreasonable to require the Department of Revenue to act within the statutory period, said, "we have had [in these cases] occasion to consider some of the administrative processes that are essential in the settlement of tax cases, and where taxing officials cannot reasonably perform their full duty within the time required by the act, an extension beyond the statutory period is warranted."

In the instant case the facts as stipulated by the

parties and those facts contained in the Commonwealth's requests for findings of fact which we affirm, viz, 8, 9, and 10,[3] show that the delay was caused by the pairing of appellant's 1954 Capital Stock and Corporate Net Income Tax Reports with the 1955 and 1956 tax reports for these taxes prior to and at the time of settlement; pairing of appellant's tax reports with those of one of its parents', Pennsylvania Power & Light Company; Report of Change filed by appellant for its 1955 Corporate Net Income Tax on August 19, 1957; an investigation by the Commonwealth of appellant's 1954, 1955, and 1956 Capital Stock and Corporate Net Income Taxes begun October 11, 1957, the

[3] "8. When defendant's 1955 Corporate Net Income Tax Report was received on April 15, 1956, it could not be paired with the 1954 Capital Stock Tax Report until sometime after November 28, 1956, when the copy of the §1105 Resettlement for defendant's 1954 capital stock tax was mailed. The defendant's 1955 corporate net income tax could not have become finally ascertained until after August 19, 1957, when its Report of Change was filed (S/F §47).

"9. The practice of pairing the tax reports of a 'system', i.e., parent, subsidiaries and affiliates, was followed, and the defendant's reports were paired with those of its parent, P. P. & L. (S/F §46). However, such pairing was not possible in 1956, as is evidenced by P. P. & L.'s 1953 Capital Stock Tax Appeal, filed in this Court on March 26, 1957. This appeal was not withdrawn until April 24, 1958. Six months later, on October 27, 1958, the settlements of defendant's 1955 and 1956 capital stock taxes were made by the Department of Revenue (S/F §47).

"10. Following the Report of Change filed for defendant's 1955 corporate net income tax on August 19, 1957, the taxing officers of the Department of Revenue requested an investigation for defendant's 1954, 1955 and 1956 capital stock and corporate net income taxes on October 11, 1957. On March 20, 1958, the results of the investigations of the defendant were received by the taxing officers (S/F §47). The reports were referred to the Legal Unit of the Department of Revenue for advice as to the allocation of gross receipts outside Pennsylvania. On the basis of the investigation information and the oral advice of Mr. Cusick, the gross receipts fraction allocation was disallowed on settlement (S/F §48)."

result of which was not reported to taxing officers until March 20, 1958; and an appeal by Pennsylvania Power & Light Company of its 1953 Capital Stock Tax which was pending until April 24, 1958.

We are of the opinion that the burden upon the Commonwealth to show that the delay was reasonable has been met and that the late settlement did not violate section 8 of the Corporate Net Income Tax Act, *supra*.

Counsel for taxpayer, in his brief, for the first time also contended that even though the late settlement be held reasonable, the notice of said settlement was not "promptly" sent to it as required by subsection (b) of section 8 of the Corporate Net Income Tax Act, 72 PS §3420h(b).[4]

This matter was not brought to the attention of the Commonwealth prior to the filing of briefs and oral argument in this court and cannot now be raised. Section 1104 of The Fiscal Code, as amended, 72 PS §1104, provides, in part, that "no questions shall be raised by appellant that were not brought to the attention of the department making the settlement, or in the application for settlement, or petition for review prior to the appeal, and set forth in the specification of objections."

We might point out, however, that had the matter been properly raised we would be constrained to say that under the circumstances of this case we could not agree with appellant that the copy of the settlement was not promptly sent.

We can find no decisions and none have been called to our attention where this matter has been raised except Commonwealth v. Andale Co., supra, in which it was the comparable section (1101(a)) of The Fiscal Code, 72 PS §1101(a), which was under consideration.

---

[4] "(b) Promptly after the date of any such settlement, the department shall send, by mail or otherwise, a copy thereof to such corporation. . . ."

The taxpayer there complained that the settlement was not made within the time permitted by law, and *also* that notice of the settlement was not given promptly. The reported case is not completely clear but it does appear that the settlement was made on January 2, 1958, and notice was given to the taxpayer on April 29, 1958, a period of almost four months. While the court did not discuss this particular phase of the case the appeal of the taxpayer was dismissed which would seem to indicate that the court was of the opinion that the notice was promptly given. In the instant case the notice was sent to the taxpayer just three months after the settlement was made; the Thanksgiving and Christmas vacation periods having intervened.

We believe that "promptly" means within a reasonable time under all the circumstances. In In Re McClelland's Estate, 109 Colo. 66, 121 P.2d 893 (1942), under a statute that authorized dismissal of an appeal from a county court to a district court of probate proceedings if not brought "promptly," it was held that such appeal after a period of 90 days was promptly brought.

See also Seamans' Estate, 333 Pa. 358 (1939), where it was said that "promptly" does not mean "immediately," and the period of one year in which a fiduciary might sell nonlegal securities was impliedly held to be prompt. In Nanticoke Suburban St. Rwy. Co. v. People's St. Rwy. Co., 212 Pa. 395, 399 (1905), the court said:

"The limit of time permissible under the term 'promptly' has not been decided, nor is it in the nature of things capable of exact determination by the calendar. . . ."

We note, too, that appellant was in no way prejudiced by the lapse of time between the settlement and the date on which the copy was received; appellant having taken full advantage of all appellate procedures.

This brings us to the question of whether or not appellant's entire business was transacted in Pennsylvania. We conclude that it was not. During part of 1955, the company was doing business in Maryland and later in the year was doing business in New York. We arrive at this determination from the fact that while the production of electric power, the principal corporate purpose of appellant, was performed in Pennsylvania, many other equally important facets of the business were performed elsewhere. Until August of 1955, appellant had no executive or administrative offices in Pennsylvania, all of this type of activity having been performed in Baltimore; the company at one time employing at that office as many as 62 employes in an office suite of 18 rooms, performing there the legal, purchasing, budgeting, engineering, financial, accounting, billing, tax, insurance, and other administrative functions. After August 1955, although most of the general office routine was transferred to Safe Harbor, Pennsylvania, most of the administrative and executive functions that had been performed in Baltimore were thereafter performed at appellant's New York office.

The Commonwealth contends that the question of "doing business," in the instant case, is answered in the case of Commonwealth v. Mississippi Central R. R. Co., 11 D. & C. 2d 623, where we held that the taxpayer, a company that operated a railroad in Mississippi and there had its principal office where it kept all of its books and accounts pertaining to the operation of the railroad, was not doing business in Pennsylvania even though in this State it had an office where the minutes book, capital stock certificate books, capital stock ledger and treasurer's cash book were kept and where directors' meetings were held. Also in Pennsylvania, a bank account was maintained, certain salaries were paid from this State, dividends and stock were

issued here, most directors lived here and the President, a Vice President, the Secretary-Treasurer and an Assistant Secretary-Treasurer were "connected with the Scranton [Pennsylvania] office," although apparently there was no bookkeeper or stenographer in Pennsylvania. We believe that that case is. clearly distinguishable from the instant case, for here there was no principal office as such in Pennsylvania where the basic corporate activity was performed, but such principal office with corporate officers and many office employes was either in Maryland or New York where the concept of "doing business" was under consideration.

In 23 Am. Jur., Foreign Corporations, §382 (1939), it is said that, "the maintenance of an office in the state for the performance by the general officers of their duties of management and supervision of the affairs of the corporation amounts to doing business therein" and, "According to some decisions, a corporation which has an office or place of business in a state is doing business therein, even if its factory, mine, or other place where its activities are actually carried on is outside the state."

In Commonwealth v. The Minds Coal Mining Corp., 360 Pa. 7 (1948), where the facts were the reverse of the instant case and where the taxpayer was a West Virginia corporation with only its sole executive and administrative office in Pennsylvania, it was held that the company was doing business in Pennsylvania so as to be subject to tax here.

See also Commonwealth v. Wilkes-Barre & Hazleton R. R. Co., 251 Pa. 6 (1915), where the foreign corporation was held to be doing business in Pennsylvania for the purposes of taxation; Mingus v. Florence M. & M. Co., 302 Pa. 529 (1931), where the foreign corporation which operated a mine in Utah was held to be doing business in Pennsylvania for the purpose of serv-

ice of process when the general executive business of the company, as distinguished from its mining activities, was performed here.

In Commonwealth v. Andrews, 42 D. & C. 505 (Phila. 1941), the Salt Dome Oil Corporation was held to be doing business in Pennsylvania for the purposes of taxation although its principal activities of finding and selling oil were performed elsewhere, and only its financial direction and dictation of policy were accomplished in Pennsylvania. Judge Sloane there pointed out that the term "doing business" as used in a statute may have different purposes, and then quoting from a Columbia Law Review article, said: (page 510)

" 'The business which must be transacted by a foreign corporation to permit service of process must be such as to warrant the inference that the corporation is *present*. To subject such a corporation to taxation for doing business, the transactions must not only show that the corporation is present but also that it is *active*. In order that qualification be rendered necessary, the corporation must not only be present and active, but its activity must be continuous.' " (Italics the court's).

We conclude on the facts of the instant case the "entire business of . . . [this] corporation . . . is not transacted within this Commonwealth," [5] and therefore appellant may use the allocation percentages in arriving at the tax due.

This, then, brings us to the matter of the gross receipts fraction and the proper allocation of the receipts from the sale of electric energy to the Baltimore company and the Pennsylvania company. The Commonwealth contends that if, as we have found, the entire business of appellant is not transacted in Pennsylvania, then, all of the gross receipts in question should be assignable to Pennsylvania and should, there-

---

[5] Corporate Net Income Tax Act, §2 (72 PS §3420b-2).

fore, appear in the numerator as well as the denominator of the gross receipts fraction. Appellant, of course, takes the opposite position, contending that the gross receipts from sale of this electric energy should be assignable to Maryland and thus not included in the numerator of the gross receipts fraction.

The section of the Corporate Net Income Tax Act dealing with the make-up of the numerator of the gross receipts fraction, after setting forth that the numerator shall be the amount of the taxpayer's gross receipts from business assignable to Pennsylvania and the denominator shall be the amount of taxpayer's gross receipts from all its business, provides, in pertinent part:

"The amount of the corporation's gross receipts from business assignable to this Commonwealth shall be, (1) the amount of its gross receipts for the taxable year except those *negotiated* or *effected* in behalf of the corporation by agents or agencies chiefly situated at, connected with, or sent out from, premises for the transaction of business maintained by the taxpayer outside of the Commonwealth. . . ." 72 PS §3420b-2(c)(3).

The question thus resolves itself into whether or not the gross receipts in question were "negotiated or effected" in behalf of the corporation by agents or agencies chiefly situated at, connected with, or sent out from, premises for the transaction of business maintained by the taxpayer outside of the Commonwealth, for in the first instance, as provided by the statute, *all* of the corporation's gross receipts are assignable to Pennsylvania except only those so negotiated or effected. What did the legislature mean when it used the words "negotiated or effected"? We must bear in mind that the legislature was attempting by these formulae to arrive at a fair measuring device to evaluate the privilege of doing business in this Commonwealth. The

Corporate Net Income Tax is imposed on such privilege and the apportionment fractions are necessary because of business carried on in other states as well as in Pennsylvania.

In Commonwealth v. Koppers Co., Inc., 397 Pa. 523, 530-31 (1959), cert. denied, 364 U. S. 286 (1960), in discussing the Corporate Net Income Tax, the court said:

"The gross receipts fraction, as well as the tangible property and wages and salaries fractions, is part of a method used to apportion the income of a corporation doing business in more than one state so that each state may base its tax on only a portion of the income, a portion considered allocable to that state. . . .

"[A]ll three fractions are designed as measures of corporate activity in the taxing state.

"All that the Constitution here requires is that the fractions be composed of elements contributing to the business activity of the company. . . ."

Were the gross receipts in question either negotiated *or* effected so as to come within the exception and thus not become a part of the numerator? Appellant relies on the contract of 1931, renewed in 1955, and the corporate maneuverings between appellant and its two parents leading up to these contracts to support its position that the gross receipts in question were negotiated or effected at appellant's Baltimore office. We do not believe these gross receipts can be said to have been so negotiated or effected. The 1931 agreement can scarcely be said to have been "negotiated" by appellant at "arms' length." Safe Harbor was created by the Pennsylvania and the Baltimore companies, was wholly owned by them, all of its saleable product was sold to them immediately upon its creation and the price charged and collected for this product was fixed, not by negotiation but by the Federal Power Commission.

Judge Hargest, the late President Judge of this court, in Commonwealth v. Electric Storage Battery Co., 51 Dauph. 90, 94-95 (1941), upon which appellant relies but which we feel is clearly distinguishable from the instant case, pointed out:

"In Werner vs. Hendricks, 121 Pa. Super. Ct. 46, 49, it is said:

'Negotiations are the deliberations which take place between the parties touching a proposed agreement: Bouvier's Law Dictionary, Vol. 2, p. 2331. To negotiate is to transact business, to treat with another respecting a purchase and sale, to hold intercourse, to bargain or trade, to conduct communications or conferences. It is that which passes between parties or their agents in the course of or incident to the making of a contract; it is also conversation in arranging terms of contract: People vs. Augustine, 204 N. W. 747, 748, 232 Mich. 29.' "

In the Electric Storage Battery Co. case, the court permitted an outside allocation of gross receipts from sales of storage batteries by the taxpayer to another unrelated company. There the negotiations at "arms' length" continued from 1929 to 1932 by an agent of the taxpayer then located at its branch office in New York, and when the negotiations were virtually completed, the agent was moved to the Philadelphia office of tax-payer, and sometime later a written contract was entered into between the parties and deliveries were begun. It was shown that, while the agent was still in New York a "gentlemen's agreement" had been reached between the parties. There, of course, the gross receipts were extensively *negotiated* in New York and *effected* there too, by virtue of the early agreement.

It seems to us that this case is clearly distinguishable from the instant case in which the product is electric energy, not tangible personal property, the price is fixed by government regulation and not by negotiation

and the gross receipts in the instant case, to all intents and purposes, were effected at the time of the creation of appellant in this Commonwealth.

To construe the language of the Corporate Net Income Tax Act pertaining to the allocation of gross receipts so that parent corporations could impose on their wholly owned subsidiary a nonnegotiated contract for the entire output of the subsidiary for a period of 50 years and executed at a point outside of Pennsylvania convenient to the parents, and thus require the allocation outside of Pennsylvania of all gross receipts for 50 years, would be an absurd and untenable construction contrary to the Statutory Construction Act of May 28, 1937, P. L. 1019, sec. 52, 46 PS §552.

Except as otherwise hereinbefore indicated, we refuse the suggested findings of fact of both the Commonwealth and the appellant for the reasons that many of them are duplications of the facts as stipulated, and others because we find them not relevant to the conclusions we have reached.

### Conclusions of Law

1. Appellant's entire business in 1955 was not transacted within the Commonwealth of Pennsylvania and therefore its Corporate Net Income Tax for that year should be based on allocations and apportionments as provided by the Act of May 16, 1935, P. L. 208, as amended, 72 PS §3420, et seq.

2. Appellant's gross receipts from the sale of electric energy produced and delivered in Pennsylvania, and sold to the Pennsylvania company and the Baltimore company, were not negotiated or effected outside of the Commonwealth of Pennsylvania and should, therefore, be included in the numerator of the gross receipts fraction.

3. The settlement of appellant's Corporate Net Income Tax for 1955 did not violate the requirement in

section 8 (a) of the tax act that the settlement be made "so far as possible" within one year after the report was filed; the delay of the taxing department was reasonable because of, (a) pairing of appellant's current reports with its reports of previous years, including its reports for other State taxes; (b) pairing with reports of other corporations in the same "system"; and (c) investigations conducted by the taxing officers and legal advice requested by them.

4. Judgment should be entered in favor of the Commonwealth and against Safe Harbor Water Power Corporation in the amount of $86,006.22.

## Order

And now, to wit, September 21, 1964, the appeal is dismissed, judgment is directed to be entered in favor of the Commonwealth and against appellant in the amount of $86,006.22 unless exceptions be filed hereto within 30 days. The full amount of $86,006.22 having been paid, the judgment shall be marked satisfied upon the payment of the costs by appellant.

The prothonotary is directed to notify the parties or their counsel of this order forthwith.